May it please the Court, Counsel. Mrs. Cadena was not in the El Paso County Jail for very long, but a lot of things happened to her when she was there between June 23rd and July 18th. And I'm going to give a brief summary of what happened. She gets in the jail, she's in a wheelchair, the wheelchair is taken away from her, she's given crutches, she's unable to use crutches and lets everybody know she can't use crutches. They take her to the medical clinic, at the medical clinic, on the way to the medical chair, take her to the clinic, bring her back from the clinic, put her back in her cell, take away the wheelchair and leave her with only crutches. And then the same detention officer returns later during the, to deliver the food at the cell block door, requires her to walk to the cell block door with crutches, then takes the, gives her the tray, Mrs. Cadena wants to sit at the table that's right there in the common area. The detention officer won't allow her, requires her to walk with crutches, carrying the tray of food back to her cell. Where she falls, she's so trembling and tired and things, she ends up spilling her drinks, falling down, and then her leg is injured, re-injured. She had a metal rod going through the tibia and the way I get the description, that rod, that leg, lower leg twisted on that tibia, on that rod, so that it was pointing in the wrong direction. She ends up going to the emergency room, in the emergency room she ends up being released, returned to the El Paso County Jail. She spends three weeks there, waiting, she's told that she's going to, she needs to see her orthopedic surgeon, and then three weeks later, she's, she ends up getting, well she gets an appointment and then she's released before the surgery is scheduled. Now I think you have to look at, in that chronology, which is helpful, but you, the first encounter she has with the jail, you, you didn't mention the fact that there was a call to a doctor who said crutches are fine. And doesn't that sort of color the whole episode? Right, there was, it's undisputed that there was a call on intake and a doctor gives an opinion, mistaken, negligent or not, she can use crutches, and then we have this saga of injuries all because of the crutches. No, I disagree. The problem here is, several problems. Number one, you have the doctor, well you have the medical intake process, it's flawed. It's flawed because it has a, someone who's not qualified doing the intake. Dr. Salazar testified that he, that they weren't supposed to give. Right, but a flaw is a mistake. That doesn't rise to intentionality, does it? They just had a bad intake moment. It's a deliberate indifference to the serious medical. Okay, but that really to me almost, and I'm just pressing you, I'm not saying I disagree with you. Yes. That to me, that's the difficulty and it may be our courts to blame. I couldn't really ever find what Fifth Circuit law said intentionality under the ADA means. I thought we said in a case called Miraglia that it's something more than deliberate indifference. So yes, they saw her stumble and fall, so they're aware of the disability and they take no action. You would get to a jury on that, but what if it's animus? What if the district court cites a case that says you actually have to show they're showing her spite? What's your answer to that? What's the best case that defines what intentionality means for the ADA? There is none. There is none. Okay. And what I was referring to, the deliberate indifference, is for the Section 1983 cause of action. Okay, not the intentionality. Well, for me, just for a minute, and I don't want to take up your time, the ADA actions, am I correct? There are two. One is they failed to accommodate her disability when they're letting her eat. That's the tray episode. And the second one is they failed to accommodate when they required her to be hobbling around on crutches the whole time. That's the most egregious. The first one is. The Davila requiring her to carry the tray and walk with crutches at the same time. To me, that's the most egregious. And the district court's answer was, well, her own statement is self-serving. And that seems incorrect legally. But the district court independently said, I don't see animus. So what's your answer to that legally? The Americans with Disabilities Act was intended to protect the disabled, to ensure that they had rights that they could use in public facilities. The American Disabilities Act, Congress went ahead and made it so that more people can use. I know. With the Americans with Disabilities Act. Am I right that we have binding authority that says we have to find something more than deliberate indifference? Is that our law or not? No. Okay. So tell me what the right law is as to intentionality in the ADA context. Where would we look? And that's what I'm trying to say. The Americans with Disabilities Act, prior to the Americans with Disabilities Act amendment, had been so constricted, so restricted in the use of the Americans with Disabilities Act to protect the public, that Congress basically slammed the United States Supreme Court and enlarged the definition of disability to be able to allow plaintiffs to pursue their rights under the act. Now to try to go ahead and make it more restrictive with something stronger than deliberate indifference would be going counter to what Congress wants. That's a good policy argument. And you may be right legally. I'm not saying you're wrong. I'm just hoping that you could give me a case. I'm sorry but I can't. That's all right. That's fine. One of the big problems here is a lot of these policies are created because the El Paso County Jail is not ADA compliant. And what's happened is the county has to modify their procedures to comply with the ADA. And I've identified a lot of policies. This case is almost entirely a lot of policies as causing this whole problem, the problems that she had. Now you don't have to show a policy under... And you're right. And you're right. But... Why would you do that? I mean to respond to that superior plies, doesn't it, under the ADA? I think it shows intention. Pardon? A lot of their policies show intention. Because what they're doing is they're trying to decrease their costs, the cost of operating the jail. If you look at the policy for unqualified persons to perform medical intakes, there's testimony. Charles Guffey, the Khorizon employee, the vice president in the other positions there, RNs are paid more than LVNs. So they want to use LVNs. But Dr. Salazar knows that LVNs aren't supposed to be making these assessments. You look at the leaving all matters to the sole province of the physician. This is intended to disincentivize detention officers. The less officers know and care about inmates' health, the less treatment's going to be given. The policies in regard to delivering food, having a policy requiring... If you had a policy for delivering food to inmates using crutches, that policy would require two inmates, two detention officers, to be present during the delivery of food. One is to mechanically open the door, and then the other one is to go inside the cell and deliver the food to them. But instead they have a policy where they have a floor card where the detention officer who delivers the food has to see the inmate at the cell block door. It's kind of a floor card issue there. And what that does is it eliminates the need for two detention officers to deliver the food if you have the person coming to the cell block door. What you're doing is you're cutting back on labor. The failing to have a policy to provide prompt medical care and requiring the state of Texas commission on jail standards requires prompt care for acute emergency situations. If you had that kind of policy, you would have to take these inmates and take them off-site to receive care. And I quote, in my brief I don't think I address it directly, but in my response to the summary judgment, I cite the Texas Administrative Code. If you look at ROA 2026, you'll see in my response that the standard for efficient and prompt care for acute emergency situations. You'll also see the health services plan for the county on ROA 2055, where they say it's a need arises. Now what all that does is it requires less labor. Referring the policy to refer inmates to preferred health care providers, it kind of accepts if they're going to have that kind of policy, it accepts that delays will occur that will result in less care because you're restricting yourself to one and you're not shopping around to find out who can see this person faster. I've phrased it in various ways, but delaying medical care to inmates not expected to remain long in jail, their humanitarian releases, where they try to release the inmate before the surgery that's scheduled, before the doctor's appointment, all that is intended to do is decrease their costs. So what's happening is intentional. At Corizon, in one of the grievances that was filed by an inmate, you know, why haven't you seen, I haven't been seen by a doctor and I've been waiting, I think it was like two months, I can't remember, it was a long time. And this individual was complaining and Corizon responds and basically lays the blame on the county for not having enough detention officers to bring inmates to the on-site medical clinic. Okay, on-site, well you can imagine what it's like taking inmates to off-site facilities. I'll go ahead and reserve the rest of my time for the panel.  Mr. McCarry. Good morning, may it please the court, Kevin McCarry, Assistant County Attorney for the Appellee County. I'd like to clarify the record just a bit. This case started when Ms. Cadena was injured outside the jail and she was then rushed to Providence Hospital, which is a private hospital in El Paso, Texas. And it's important to keep in mind that at Providence the surgeon inserted just one screw and the experts in this case and the revision surgery show that what she really needed to properly fix the rod in her leg was three screws. So the surgery that she received later on was a revision surgery, not a surgery to treat any new injury that she suffered in the jail. That's only one of El Paso's factual propositions, but there's a great deal of testimonial and her leg became deformed. So it's possible it wasn't structurally sound, but then if in jail they create a situation that she then re-injures it. And I'm not sure that I can agree that she actually re-injured her leg. When she was taken to University Medical Center, she was released from the ER in just five or six hours, it was early the next morning, and Dr. White and his records said there's no new fracture here, she needs to follow up and see what the deal is with the previous surgery. Can you procedurally help me? Did the magistrate deny summary judgment on the failure to accommodate with food delivery? I believe that the magistrate expressed concern about the food delivery policy. And one of the things that I want to point out is that Cadena was in jail for just two days before the alleged second fall. But on that point only, it seems to me you couldn't have a more classic ADA violation than if you say to someone who has a boot on and a broken leg, use your crutches to come carry a tray. And I don't think it's in the record or very well established that that actually happened. For one thing, Officer, there's a dispute, but there's no genuine dispute that Officer Gavila wasn't actually in the cell block that day. Officer Lopez was in the cell block that day. And everybody who testified about how food is actually delivered is that it's delivered by hand. Why? Because it's the right thing to do, there's no dispute about that, and also because it's faster. But you would agree this has to go to the jury if there's evidence in the record that she wasn't delivered her food by hand? I would not, because there's an intervening cause, which is that the doctor said that she could use crutches. Right, but the doctor didn't say use crutches and somehow magically carry a tray, too. I mean, that's just physically impossible. Well, there's a difference between weight-bearing and non-weight-bearing when you're moving around on crutches. And there was no distinction that was drawn for the officers between the two. The officers were simply told she can use crutches, she can get around. By relying on the doctor, you don't get to the intent element of the ADA. No, again, we're just asking is there a dispute of facts. If there is any record suggestion that Davia was the one who was helping her down the hall to the clinic, sees her stumble, catches her, puts her in a wheelchair, but then it's Davia that goes to the door and says, you've got to come walk to the door to get your food and carry it back with crutches. Right. If there's record to support that scenario — Well, there's not, because there's still the — I'm asking you to assume, if there is record evidence to support that, would you agree with the magistrate that their summary judgment would be inappropriate? I would not, because it's — I don't — I can't agree that it's a material fact, even if it's one that's in dispute. The materiality turns on the fact that there's no intent, because what happens is Davia, as agreed — everybody agrees — on a separate occasion, Davia was escorting her. She evidently stumbled on her crutches, and then she was — Davia took the step of putting her into the wheelchair to go to the clinic for evaluation. So the clinic, once again, intervenes and is the intervening factor between what happens next in terms of the food delivery. But Salazar nor the clinic — in fact — well, two points. Salazar and the clinic never said, it's legitimate, it's a reasonable accommodation to give her crutches instead of a wheelchair, plus carry something while she's using crutches. There's no medical evidence of that anywhere, number one. And then number two — but correct me if I'm wrong — on the day she falls, trying to carry the tray with the crutches, the prison itself had already said, give her the wheelchair back. They'd done that at 10.30 in the morning. She falls sometime in the afternoon. Is that correct? The — I think you are correct that the jail had said she could keep her wheelchair as well as the crutches. Now the challenge is that I don't think there's any evidence that the wheelchair will actually fit into her individual cell or that that's actually required. So — Well, you can fold up wheelchairs. You can get a wheelchair into a cell. Well, I don't want to go down that road too much, because I — either way, it could have been left right outside. But I think what my — But you're not addressing the absurdity of the facts. It's not going to help her get to the door to get her tray if it's outside. No, no, no. I mean, let me explain how the jail is set up. What I was getting at is these are cell blocks. There's eight on one side and eight on the other. So — and in the middle you have a common area. So you could, if it were necessary, accommodate her by putting her wheelchair outside her individual cell with her crutches inside the individual cell. I didn't — I wasn't suggesting that it would be proper to put it outside of the cell block. And I don't think that there's — I'm just asking how can this lady eat? Right. I mean, imagine someone crutching to a door and then somehow also carrying a tray back, and lo and behold, she did fall. Right. And I would have to concede that that sounds to me like rather serious negligence, but I'm not sure that you get to even deliberate indifference, because even assuming that Officer Davila was in the cell, there's no evidence that she took the further step of thinking to herself, I don't like this lady because she's disabled, and — or I'm just not interested in going through the extra step. But you do agree that intentionality is met by deliberate indifference. That is what we — there would have to be. No, I agree that that — that this Court has never decided what the intent element is. But you just used that. Right. You just said there's no deliberate indifference. Right. Are you therefore saying even though you describe that as the element, you don't think it is the element? That's — No, I'm saying that you don't need to decide because we get to — she doesn't get to deliberate indifference. But you're denying intentionality, so help us to understand if the phrase you just used equals intentionality, deliberate indifference. I would have thought it does. If it doesn't, tell me the law that is something more, and what the something more is. The — first of all, I agree that it's a useful framework. And what I was getting at is I don't think that this Court has ever decided what the level of intentionality is. So when I use the term deliberate indifference in the ADA contents, all I'm saying is if that's, you know, the lowest that the — the Court would accept, then she doesn't get there because all she has is — is an allegation of rather serious negligence, and what might even — you know, the — the courts have eschewed medical malpractice, the courts have — they — well, here's — for me, this is what — deliberate indifference is if we accept that as the intentionality standard is something greater than gross negligence. And I think that that's the absolute — You know of a disability, and you ignore it. And her allegation, whether it's true or not in the long run, is De'Vea knew she couldn't even use crutches because De'Vea's the one who puts her in the wheelchair. But then De'Vea's the one that brings the tray and expects her to walk with the crutches she knows she can't even walk on without a tray. How is that not deliberate indifference? That sounds like it's close to spite. It's purposeful. Let's see if you can walk today. Right. For me, the question is answered by the fact that those crutches have been — nobody ever — you — you have an inmate who had been in jail for a total of two days, and you have this concededly a little bit vague order from Dr. Salazar that says, can have some crutches in her cell, and everybody says, well, first of all, we don't ever make them do it the way that she alleges, but also we didn't have any further direction in those two days as to how to go about accommodating her. Other parts of the direction that they got were rather explicit. She needs a bottom bunk. She needs her own cell. She needs her own cell in a locked-down cell block for safety purposes. What is it you don't make them do — you said we don't make them do it in the way she described it. Do what in the way she described it? Well, I was returning to my discussion with Judge Higginson that the testimony from all of the officers is they hand-deliver the food. The way that it's been alleged simply isn't what happens. But even assuming that on this day, for whatever reason, somebody was a little bit — The testimony from the officers is they do what to her food? They hand-deliver it. So when you have — Hand-deliver? Hand-deliver it. When you have — They hand-deliver it? Yes, sir. To a place where she can sit and eat? To her individual cell. When you are in the medical cell block, is how they had it at that time, they — So they open the door and they hand it in to her? They walk in. Their testimony was they walk in and they hand-deliver to each individual cell, in part because it's faster. Maybe I'm picturing this incorrectly. You told me there's two units, one on either side. Correct. There's a common area in the middle. Correct. Do they walk into the common area or are they walking into her individual cell? The testimony from the officers was that they walk to — they walk into the common area and then walk to each individual cell and hand-deliver the food. All right. So the answer is no, they do not walk into the individual cell. No, the door is open. They hand it to them and keep going. All right. And so the person has to get to the door of their cell. Is that what happens? They don't walk in there and hand it to them? I — that's — And I don't know how big these cells are. Uh-huh. But apparently she needs to get up, get onto the crutches and get to the door. I have to concede that I have not looked at that part of the record in a while, and so — That's exactly the nub of this case, it seems like. If she's got to get to the door with crutches and then carry a tray back, that seems like a failure to accommodate that's intentional. If they walk into the cell and put it on the table for those inmates that can't move around — and I thought that's what they said they'd done, but it isn't that clear, you're saying? And I — You just don't remember. In all clarity, Judge, I have not looked at that — at that portion of the record in a while. The plaintiff didn't say that's what they did, is it? And the — no, the plaintiff claims that she was forced to walk out, all the way out of her cell. All right, so why isn't that just a conflict in the testimony? And — well, I would have to concede that it is a conflict in testimony, but that brings us full circle back to the standard, which is that even if somebody was a little bit sloppy and said — and took it to the individual cell or made her come out, they were all relying on Dr. Salazar's order and the barely two days that she was there while they were trying to figure out how to accommodate her. Weren't these the same guards, or at least one of them the same guard, that saw her almost fall on the way to the clinic and they got her a wheelchair? That is what she has alleged, yes. That — I mean, that's in the record. Isn't that right? That is in her testimony, yes. Well, you want to discount her testimony? And — well, I'm just acknowledging that there is a — that while there may be a dispute as to that fact, there — I don't think it's a material fact. And then why is that, if we're talking about whether she — whether they had noticed that she had a disability that prevented her from walking to the clinic? And, right, as I was discussing with Judge Higginson a moment ago, where she went, when she went in the wheelchair, was to the clinic, at which point a clinician then looked at her and didn't issue any instructions to the guards as to any more detail about how she was supposed to use crutches or how she was supposed to be delivered her food. Well, but Dr. Salazar said in his testimony that when he issued the order for crutches, he intended that she have the crutches just as an alternative to the wheelchair. Now, the fact that he didn't convey that to the guards is not her fault, is it? No, I don't think it is. But it's also not off — So what I'm getting at is, why — how can you rely on the fact that he issued crutches under those circumstances? How does that help you? Because it goes back to the intent standard, which is, what is the guard's intent? Is the guard — is the guard thinking about, I'm going to do something wrong because she's disabled, or even if it's a little bit more inferential than that, or is the guard simply engaging in a bit of negligence by not following up as to how to deliver her food? There's a difference between doing something less than perfect or even doing it wrong and doing it with an intent to discriminate against somebody because of the ADA. Another guard's testimony was she does get found on the floor with the food around her. Right? That isn't her own testimony. That's a guard's acknowledgment. In her cell, I believe so. Yes. So that doesn't sound like she's sitting at the table and they hand it to her. That sounds like not just self — you know, arguably her testimony. That sounds like the prison officers themselves confirm that somehow she had to be in the middle of the room and she's on the ground with the food around her. Right. I don't — I'm not sure what you're getting at. I don't think there's much dispute about how she was found. I guess I'm back to this. It seems to me even if crutches would work with a boot to get around, crutches with a boot do not work when you're also being asked to carry a tray that needs two hands. Just physically impossible. Oh, I couldn't dispute with you the difficulty of carrying food on crutches. That would be — I don't think that's what's in legal dispute here. What's in legal dispute here is why they made — why she was allegedly required to do that. As to the second ADA claim, that it was actually also an ADA violation to not give her a wheelchair because it was obvious she needed one throughout, is your position what I thought the magistrate and district court's position was, which is that a wheelchair is always medical treatment. It is never an accommodation that could be required under the ADA. Do you think I'm reading their decisions correctly? And if so, do you agree with that? Or do you acknowledge a wheelchair is an accommodation under the ADA? I think I know what you're getting at. A wheelchair, of course, could many times be an appropriate accommodation under the ADA. The difficulty here is that everybody thought that she could walk on some level. And we go back to Providence where the physical therapist and where the doctor were telling her she needs to be up and that she actually completed the act of walking 50 feet on her crutches. A summary judgment wouldn't be appropriate because a wheelchair is never needed when crutches are offered. You aren't resting on that position. Would you mind repeating it, please, Judge? If you have to do a reasonable accommodation and a person has a broken leg, I was wondering whether you were urging as a legal position that crutches would always be sufficient. No. I am urging that they were sufficient here. But you're not urging that as a matter of law. I am not, as a matter of black-letter law, no. And we pointed out in the brief there are many times when courts have sided with us or with our position. But no, I would not say per se everyone in a wheelchair is met by simply walking on crutches. You need to have an evaluation, which is what occurred here. You discussed in your brief or you argued that the 1983 applies instead of the ADA because of failure to treat? Well, there were two. I want to make sure I know what you're asking. There's two different sets of claims, one under Section 1983 and a different set of claims under the Americans with… You agree that the ADA is a statute that applies here if anything does. And the ADA is applicable, certainly. Okay. I don't think that there's any argument that the court didn't have jurisdiction or something over the ADA claims. No, I'm not talking about jurisdiction. I'm talking about the standard of care that applies. Right. Yeah. Right. So, you know, with respect to the standard, there's been this discussion about everyone I think agrees that deliberate indifference is the standard under Section 1983, but there is a little bit of an open question as to whether or not it is the standard under the Americans with Disabilities Act. Most of the cases you have, if the defendant has notice, and it's obvious to them that they need an accommodation, which they can give, and they don't give it, then that's all they have to show. Well, they have to show, first of all, that I think there's actually two prongs, I think, under Miraglia. First of all, you have to have some knowledge of what the accommodation is, either because the person asked for it or because it was established. She kept asking for the wheelchair. There's no dispute that she asked for a wheelchair. The dispute about it is the fact that the doctor had said on some occasions she can keep the wheelchair and on other occasions she can use crutches. And so what I'm saying is if there was confusion that the officers failed to clear up about whether or not she could use crutches only, that looks to me like something less than deliberate indifference if, in fact, that is the standard. Well, if the doctor says that the standard procedure, which he intended to be following this case, was that she be allowed to have the crutches just as an alternative, but she be allowed to have the wheelchair, and that doesn't get conveyed, I mean, how does that help your case? Because, well, what I'm getting at here is that the officers didn't have the knowledge. We're not required, and I'm out of time, but if I may... You may answer. What I'm getting at is that the officers have to have knowledge of what... We're not required to accommodate the actual disability. We're required to accommodate her limitation. And if the officer didn't have knowledge of what that limitation was, then I don't think you'd get to even the deliberate indifference standard even if... Don't you get to it with the doctor who has the obligation to convey that to the guard? I mean, the doctor had knowledge that she needed a wheelchair, and it's his obligation to instruct the people to carry that out. Isn't that right? I don't think the doctor had the knowledge by virtue of the fact that he also ordered crutches, and nowhere does he say, she needs the wheelchair. Well, I mean, isn't that pretty clear when he says... I said, give her the crutches to use as an alternative to the wheelchair. Right, but that's the point, is why can't the officers rely on that and say, you know, to use crutches, which is consistent with what everyone... What the doctor at Providence said. But the doctor is the same one that caught her and put her in a wheelchair. Yes, that is alleged, yes. All right, thank you, counsel. Rebuttal. Listening to what was going on here, I got a couple of concerns that I have. First, the use of R-Line, the United States Supreme Court case. That should be applicable in this case. They set forth the standard for reasoned medical judgment and whether it can be used as a defense. Here, there's no evidence of reasoned medical judgment. There's none whatsoever. Dr. Salazar, in his testimony, he said he had to defer to the orthopedic surgeon. He wouldn't make any opinion in regard to Mrs. Cadena. He wanted the orthopedic surgeon. So any decision that he made wasn't based on any reasoned medical judgment. There's discussions about the alternative and his saying it's an alternative. There's genuine issues of material fact in connection with his testimony on that. There's a lack of credibility. We have the detention officers and the prior orders that were given. And you'll see it probably more clearly in the response to summary judgment. But these orders for may keep wheelchair, may keep blanket, may keep, all that is is an authorization that that person can have it. We had one detention officer testify to that. If the doctors, if there was any negligence, it occurred after the, and I think I've said this before, it occurred afterwards, after the medical intake. Dr. Salazar didn't, had an LVN during the intake. LVNs, you know, the county tried to come out and say, hey, you know, this is, they're authorized to use this. And I've showed you the Nurse Practices Act and their definition of focused medical care and how- Are you saying someone else should have been doing the intake? Excuse me? You're saying someone else should have been doing the intake? I'm saying to have given proper care, they needed somebody who was qualified, who was authorized by law to be able to do it, and that would be a registered nurse. Because here, they're operating illegally using an LVN. Now, they made a statement that Davila was at the, well, that Margie Lopez is the one who delivered the food. In their brief, they say there's an issue of fact. I agree there's an issue of fact. Detention Officer Naylor, who did the investigation, she saw that it was Margie Lopez at the console at the guard station. Can you help us clarify with the line of questioning before? Was it the officer's testimony that normally they would walk the food into the cell right to the table for disabled inmates? Or do they leave it in the middle of the place, or do they just come to the door? What did the officer say? Okay, I want to clarify something in that regard and point out something that hasn't been risen, and then I'll get to it. The trustee, Puebla, okay, he's a witness in this case. He was in the jail when he gave his declaration. He testified to the procedure, and it's the same procedure. He says two procedures are used. One is that they'll take it to the door, take it to the inmate. Other times, they'll just force the inmate with crutches to go to the cell block door. He describes one incident with an inmate by the name of Chavez, who he gave a description so that they could try to figure out who this guy Chavez was. And he said Chavez was required to go to the cell block door and carry the food tray, and that he intervened and grabbed that food tray to help Chavez because he knew it was impossible to do it. The officer did testify that there are two ways to do it. Okay, that they did. But Cadena is saying that this is the way it occurred. And with the food on the floor, with her description of what occurred, that's sufficient evidence. Nobody says that there's a wheelchair inside the cell. Naylor, the detention officer Naylor, investigated it, and she didn't see it. Thank you very much. All right, thank you, counsel. The court will take this matter under advisement. We are adjourned. Thank you. Thank you.